General McReynolds for the appellant Pharma Safe, what is the full name, Pharma Safe Industrial Services Incorporated on its cross-claim against the PAP Lee Housman. Just a minute counsel. Mr. Swallow, do you have a role in this case? I know it's a convenient place to watch, but you must not have a flight back to Corpus right away. You may proceed. I can proceed. It's an honor to be here and before the court. This is my third time in front of you, Judge Southwick, on maritime indemnity. You haven't been damaged every time. What's that? No, I hope I get a 3-0. I won the first two. I hope to win this. I want to begin with quoting some language from the decision of the Supreme Court barely two months ago in the Great Lakes Insurance Assay v. Raiders Repeat Realty Company. If you're not familiar with the case, it was a 6-0-1. I only have the slip opinion here. I don't think it's been published in the U.S. reports yet. But anyway, this involved the 9-0 decision by the Supreme Court to enforce in maritime contracts choice of law provisions. But I want to read some of the justifications that this is on page 5. The court has recognized, for example, that the parties to a maritime contract may select the governing law by, quote, clearly manifesting an intent to follow that law when entering into the contract. It went on that it's opined, as long ago as 1953, that except as the law which the parties intend to apply. And like choice of law provisions, down in the following paragraph, forum selection clauses respect ancient concepts of freedom of contract. And like choice of law provisions, forum selection clauses have the salutary effect of dispelling any confusion on the manner for resolving future disputes, thereby slashing the time and expense of pretrial motions. And the last quote, well, the reason for their doing that, the policy reasons, because enforcing those provisions by reducing uncertainty and lowering cost of maritime, advances the fundamental purpose of federal maritime law, which is the protection of maritime commerce. And I'm going to quote that the court has stated in a number of cases that it is no injustice to resolve disputes under the law that the parties have been agreed to be bound by. Now, I'm going to suggest and argue to the court that every one of those statements in that decision, applicable to forum selection clauses in a maritime contract, apply with equal measure to reciprocal indemnity agreements that have been recognized and enforced in this circuit for at least 40 years. Okay? Starting, you know, in the principal decision in that case is the Fontenot versus Mesa case, right? And I want to go to what we're dealing with here in the dispute between PharmaSafe and Hausman is a reciprocal indemnity agreement that was entered into in 2013 between Hausman and Oceaneering, which is the owner of the deep side vessel, the Ocean Patriot, on which the injuries sustained by the plaintiff, Daryl Cole, happened. Okay? And just conceptually, reciprocal indemnity agreements are very simple in concept. If you have two parties to a contract, one usually is the company or the owner of either the vessel or the platform, and in the contractor who's supplying services to the owner, and they both define in their agreements those members of the company's group and those members of the contractor group. And they agree in a contract that if any of the member of either group sustains an injury as a result of the operations for which they are engaged, then the company, if it's a company group member, the company will pay for those damages regardless of the fault, regardless of the cause, and regardless if it's all a result of the fault or the negligence of the contractor group. Well, Kelsey, you certainly think Fontenay, Fontenot, whatever name it is, pronunciation is, is the more relevant opinion. We have had some cases since then dealing with third-party property damage, not injury to employees. It does seem to me that the one key problem with this case is the nature of the illness, not injury, that was suffered by this poor fellow. And he was there on that location because of the contract. He was there for the work he was to be doing there, but the illness, the stroke, as far as any evidence shows, has nothing to do with why he was there. Now, what happened thereafter, how well he was treated is a different question, but I'm just talking about the stroke itself, being an illness for which this indemnity would apply. There's nothing like that in any of the cases that you cited, and it does seem to me the relationship to the work is probably non-existent. He just happened to be at that location when he had the stroke. So help me, are you saying the stroke itself, even if Pharma had treated it perfectly, the stroke itself would still be covered by this knock-for-knock? No. The stroke is not what triggered the indemnity obligations under Oceanair's contract with Hausman. It is an illness or is it not? It was the negligence or the alleged malpractice of the on-board medic in the onshore position who failed to diagnose, misdiagnosed, mistreated Mr. Cole when he first reported his symptoms. The on-board medic, Mr. Keith Thompson, after Mr. Cole reported to him, thought he was suffering from seasickness or an abscess in his mouth. He gave him some seasickness pills to tell him to go rest for a couple of days. He felt better for a couple of days. The ship wasn't operating because of bad weather at that time anyway, and then the fourth day, on the 19th, he gets up and he says he feels better. He goes back up in the crane. Remember, he's a crane operator that was supplied by Hausman to operate the crane on the deep side vessel, the Ocean Patriot, and he climbs up and starts operating the crane. Then he feels he has an episode, right? Only then, they come back down, and only then did he become aware that he might have had some earlier event, and so they ship him back. The expert testimony that was produced and elicited in this case showed that the first event that he had when he reported his symptoms, he was suffering from a transient ischemic attack or TIA, which was missed. So when the lawsuit was filed, a lot of parties were brought in. Hausman filed a third-party demand under Rule 14a and also 14c, but that's not relevant. Brought in PharmaSafe. PharmaSafe, as a member of Oceaneering's company group, filed a cross-claim for defense and indemnity, which Hausman had agreed to provide to Oceaneering and all of its members, and that's based upon the allegations of fault against PharmaSafe for mistreating and misdiagnosing Mr. Cole's symptoms. I examined the district court's opinion to see where this issue was explored. Also, obviously, the briefing. Appellees say that this argument, at least to the level of saying it was reasonably foreseeable that this sort of malpractice could occur, was not an argument made in district court, and I don't see where the district judge really dealt with this with much . . . didn't give the argument that you're making now much attention, that it was the negligence of the medical care provider, not an actual doctor, I guess, that is the central part of your claim. Tell me what did happen in district court that supports what you're arguing now. Well, that was the allegations of fault against PharmaSafe that was made in the Rule 14a, gender, that they were negligent, they committed malpractice. He had also not only brought in PharmaSafe, but he brought in the onshore physician, Dr. Robert Davis, to try to get out. But remember, all this happened and was resolved by motions for summary judgment. We never got to a trial, right? So there was no actually finding a fact on anything. It was all allegations of fault. But the allegations of fault that brought PharmaSafe into the case were allegations of negligence, malpractice, mistreatment, misdiagnosis, all right? So we get close to the trial and after Mr. Cole settled with Housman, his direct employer, for its liabilities to Mr. Cole as a seaman and maintenance cure, preserved all its claims against all the other parties in the case, including Ocean Airing and PharmaSafe and Dr. Davis, they settled the case, okay? So we're up here, they settled the case, and we're the only party appealing the denial of the motion for summary judgment that PharmaSafe had filed seeking a defense and indemnity for, uh, as a member of Ocean Airing's company group for the allegations of fault. And there's no question that everybody was pointing the finger at PharmaSafe's misdiagnosis as the cause of Mr. Cole's injuries. Negligence of a member of the company group was the basis for the claim and it was the reason for the settlement. It wasn't the stroke, it was the negligence in failing to that would have prevented the damage that he allegedly suffered and which an expert was going to testify at trial. So that's the issue. Let me ask you, let's say that negligence didn't occur and all we have is the stroke. I'm not particularly asking you to argue against yourself, but I'm trying to see how this fits into your argument of how to read these three cases that all of you are talking about. Why wouldn't, in your analysis, the stroke itself be something for which, because the employee was on Ocean Airing's platform, at the time that the stroke occurred, would Heisman have some responsibility for it if Cole had been on Heisman's property? So why wouldn't Ocean Airing and Pharma be liable if the stroke happened on their property? Well, Heisman was brought into the case by amended complaint directly by Cole. Yeah, I'm just trying to figure out how your analysis of this case law on liability worked. And so why, in your sense, of how this ought to work, and we don't look at the contribution of the would-be other party to the actual injury, you're saying we shouldn't look at that. So why would it matter that no negligence on the part of Pharma was alleged? Why wouldn't the stroke itself be the liability of Ocean Airing? It might very well be the liability for work-related injury against Ocean Airing, that's true. It might be very well the basic liability for Heisman as a direct employer. But we're a third-party contractor who's defined, included in the contractor group, and the allegations against PharmaSafe is for its negligence. No different from if some other contractor on that vessel was performing its work, performed it negligently, and it resulted in some injury to some other employer, in this case Mr. Cole, right? The argument that they make in their brief is that it doesn't apply, not because they're not a member of the company group, and not because there aren't any allegations of fault, it's because they say it only applies if the injuries that Mr. Cole sustained occurred while he was actually operating the crane, and as a result of operating the crane. I think the argument, if it occurred as a result of, not necessarily that he was operating it at the time, but that some stress or whatever may have led to it. Well, you know the allegations better than I do. But the point I'm going to make is that that is not the law of reciprocal indemnity agreements, and it's not what Fontenot held. You don't have to be engaged in the work at the time in order to cover it under a reciprocal indemnity agreement. If that were the case, it wouldn't be a reciprocal indemnity agreement. It's rewriting what the parties agreed to. Is there any agreement among the parties that specifically required medical care to be provided? Absolutely. PharmaSafe had been under a contract with... Well, which one of the contracts actually refers to medical care? The contract between PharmaSafe and Oceaneering that entered into in 2008. Okay, but how about that on this reciprocal liability agreement? Is there anything there that would require coverage for medical care as well? Well, PharmaSafe was the only medical treatment or person that were available to anybody working on that vessel during the time. So when Mr. Crane, who was supplied for a 28-day shift, his only access to medical treatment was the medical treatment that Oceaneering, as the owner of the vessel and the company of the company group, provided him. So if anybody would have an injury on the job, their first reference is to go to the on-board medic to see if they can get some remedy, right? Well, right. As a practical matter, I was looking for it as a contractual matter. You'll have time for rebuttal. But let's not forget, Hausman has been providing... Am I running out of time? Oh, I'm out of time. I'll save it for my reply. Yes, sir. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, Alan Davis representing Hausman North America Services. I think our position in this case is very simple. It's that the district court got it right. The district court's order applied correctly to the standards set forth in Fontenot as that standard is then discussed and limited in the subsequent cases from this Court. It does seem to me the subsequent cases are so different factually. We talk about property damage to a third party as opposed to an employee. So I will say the only one that's directly on point is Fontenot. Well, I think it's not on point because the facts in Fontenot, the relationship between the services that the indemnitor agreed to provide in Fontenot and the injury were strikingly different than they are here. Fontenot, the indemnitor, Mesa, agreed... Its contracts required it to operate the rig that the worker was on the way to and the vessel that he stopped for a... that the helicopter stopped for a... But the injury here derives from the negligence of the medic, not just directly from the stroke. That's disputed, actually. I think our position is it doesn't matter because neither of those arise out of the services that we agreed to provide. The stroke, by all accounts, didn't arise out of the services. The services required Cole to be where he was. And by being there, he couldn't be going home every day. So 28 days or whatever it was that Cole was supposed to be out there. One of the reasons I was asked to oppose and counsel about what actually sets out in contractual form the obligation for medical care to be provided to people where Cole was, was for me to understand how much this was anticipated. But it does seem to me, isn't it true, that Cole being there and whatever medical attention he would need while he was there would be at least implied as a possible situation? Well, Judge, there's no evidence, nothing has ever been cited by PharmaSafe that there was an expectation of, on the part of Houseman, that certainly not medical care of this level would be provided on board the vessel. The reasonable expectation . . . The expectation, I think you're getting to my point. Is there no contractual document that says among, I like the phrase, knock by knock, that those obligations, which each is going to identify, would include medical care? There's nothing in a contract to which Houseman is a party that addresses medical care. Because the expectation of Houseman is that, maybe there's somebody on board that can treat bumps and bruises, scrapes, things like that. Many of the vessels out there to which Houseman assigns crane operators don't have a medic in the first place. The expectation is that if somebody has a prolonged illness or a serious illness or a serious injury, they're evacuated because the care is provided by a hospital back on shore. So here the . . . Back to the bumps and bruises, which gets into diagnosis. If . . . Are you saying on bumps and bruises, if that's negligently provided, wouldn't there be some indemnity obligation? Again, if it arises out of the crane services. And our position is not and has never been . . . Well, crane services, crane services require that Mr. Cole be where he was, even when he wasn't on a crane. I agree, but there, again, there's nothing about, and we asked for this in discovery, we asked for requests for admissions, we asked in interrogatory, we asked seven ways to try and find out. What is it that their argument was in the district court that his presence on board the vessel, even one step removed from crane services, his mere presence on board the vessel had anything at all to do with his injury or his illness. And their response was, we have no evidence of that. I see in the district judge's opinion this discussion of what was acknowledged in discovery or wasn't denied in interrogatories and whatever. How central is that to your  because, again, yes, this was decided on summary judgment, but they have the burden of proof to show that indemnity is owed. And in a summary judgment context, they have the burden of at least showing some evidence of a plausible argument that indemnity is owed under the facts here. And the fact is, that was never established. There was no evidence in the court. I mean, even now, they don't suggest that there is any evidence. What should they have established? What is missing from this record? I don't think there's anything missing from the record. I'm sorry. I didn't mean it that way. What did they need to put into the record to support an obligation? Using the phrasing of International Marine, it would be a requisite connection between the crane operation services and the injury or illness. And there is no evidence of that. I think, and again, Fontenot even said, yes, it's things that are reasonably anticipated. There's no evidence that they produced that Houseman reasonably anticipated that he would receive neurological diagnosis. And actually, we use the term diagnosis and misdiagnosis. The medic in the case actually testified he didn't do a diagnosis. Nobody did. Essentially, Mr. Cole sat on board the vessel for four days without receiving any diagnostic care or any treatment of any substance at all, simply because PharmaSafe just decided not to do anything here. And I think for PharmaSafe under those circumstances to turn around and suggest that the innocent employer owes indemnity merely because it's our employee, and that's essentially, that is all they argued to the district court. Their argument in the district court was not that this injury or illness arises out of the services or the contract. Their argument was it doesn't need to arise out of the services or the contract because he's your employee. And I think that's where they fundamentally go wrong. The argument that, OK, this is a mutual indemnity. It's a knock for knock. A knock for knock contract adds an element to an indemnity clause, which is that he must also be your employee. But it doesn't, there is no case law to support that it removes the other element that the injury must arise out of the services you provide. And I think that's where their argument has broken down since the start, is if you look at their cross-claim against Houseman, they make no allegation that this injury arises out of Houseman's contract or services. If you look at their discovery response, when asked those questions— Are you getting back, though, to what the interrogatories asked? Because the interrogatories could be interpreted, perhaps, to be saying, are you taking the position, your opponent here, are you taking the position that this injury was caused by a rose out of the being in the crane, sitting in whatever it is, a seat, and operating the levers? And they said no. Or I don't know which way the answer goes. It seemed like it was a double negative. That's one thing, it seems to me. It's something else to say it arises out of all the requirements of operating that crane, which includes the necessary realities of operating that crane, is you have to be at this location for 28 straight days, or you can correct me, whatever number of days it was. So that to me is different, and it doesn't arise out of operating the crane, but it does operate out of being assigned as a crane operator to Oceaneering's location. And yes, I believe it was a 28-day engagement, but of course, and it happens all the time, and I'm sure your honors have seen this case many times, that engagement is immediately interrupted if there's an injury or an illness that requires medical care. The employee is evacuated to a shoreside medical facility for diagnosis and treatment. Something could happen on the vessel initially, some initial provision of medical care, and I guess however long it goes on, are you saying there's no responsibility for negligent application of that initial medical care on the vessel or wherever it may be? I suppose you could come up with a hypothetical where that would be an issue. That's not the case here. The argument here is not that he wasn't able to be transported in time. The argument is not. The argument is that they didn't attempt to transport. They essentially put him in bed and said, well, just lay there until you feel better. Meanwhile, the injured man in this case was telling them the whole time. They said, we think it's just seasickness. He said, I've been working offshore for decades. I've never had seasickness. It's not seasickness. And the medic essentially said, well, nothing. He said nothing. I'm not sure I understand this whole line of argument. What you're basically saying is that they were at fault. Is it? I'm sorry. What you're basically saying is they misdiagnosed him. Well, they didn't perform. This was a small thing. They should have sent him back to shore because this is a big thing. I think they should have. Yes. And to that point, up until literally the day of settlement, the defense in this case, all of the defendants were very aligned that there was serious medical causation issues here. I don't think those have to go, those go to the indemnity issue. Because again, under any theory at all that's been asserted, there is no requisite connection between anything That's the debate we're having, right? Exactly. Is the fact that Mr. Cole was your employee and had to be on site for all this period of time and therefore was subject to the health care provided by Ocean Air, is that enough to trigger the indemnity? That's the question before us. Well, yes. But again, I would say that that question, that theory of the case was never argued to the district court by PharmaSafe. PharmaSafe's argument to the district court, again, and they said it very clearly in one of their briefs, they said the only issue, it was in their reply brief on our summary judgment, it's in the record at 2313-20, they said the sole issue for this court to determine is whether Houseman, as Cole's employer, is required to provide defense and indemnity for an injury to its employee while the employee was court needs to determine whether this claim, this injury arose out of Houseman's Crane Services. Because again, under their theory in a knock for knock world, the only two elements of a claim or of an indemnity are there's a claim and it's by your employee. But there's a third element. The third element is it arises out of the services we agreed to provide. And that's the element that they've never alleged, they've never addressed in any way. Well, the language you just recited from their district court briefing sounds like it does map on to that. I'm sorry. Go ahead. I'm saying they've, again, their argument, the sole issue was whether he was there, our employee, employed on board the Ocean Patriot. He was our employee employed on board the Ocean Patriot. But his injury and his illness didn't have anything to do with the services. And not even that he wasn't sitting in the cab of the crane at the time of the stroke. He wasn't on his way. He wasn't suffering from heat exposure in the time that he was on the crane. He wasn't injured by somebody else while he was sitting in the crane. Again, there is no connection. None has been alleged. None has been suggested in any evidence in the record. Did Cole have to be there for the 28 days? Be on the vessel, absent an injury or a reason to leave? Yes, that was his assignment. Why isn't that enough? Because nothing, and it's stipulated, well, it's admitted, because nothing about his presence on the vessel had anything to do with his injury or illness. Oh, but why he used their healthcare is because he had to be there, I thought. Well, he had the option for other healthcare, which was to be evacuated, which is what the expectation is of everybody who sends their workers offshore, is that if there's a medical incident, you evacuate the worker. That's what he wanted. He wanted, at least I'm going to theorize this, looking at hindsight, he had a stroke. He would have wanted to be sent back to shore. I get that. That's the theory of misdiagnosis. I'm not sure why that's a response to why he had to be there in the first place. I agree that he had to be, I mean, his assignment was to work on board the vessel for that period of time. But I disagree that that limits his ability to receive adequate medical care. First of all, when there's, again, nothing in a contract that Houseman said, oh, we're aware of PharmaSafe's presence out there. Houseman's never heard of PharmaSafe before this case. We're aware that they'll be providing medical care, that they will be the only option for medical care. That's not the world that people live in when they're working offshore. The world they live in is that if there's an incident or an injury, you can be evacuated, and that never happened in this case. When he first experienced the symptoms of his stroke... You're saying PharmaSafe is at fault, but you're not saying whether there's an indemnity. Well, our first position, and I guess there's alternative positions that we've had in the district court and still have, which is that, one, as PharmaSafe continually has said, this was a dispute, whether there would have been any evidence at trial or enough evidence at trial to meet a medical causation standard in the first place. Without that, there's no claim to be indemnified. So that's one position. The second position is... When you say evidence of medical causation, medical causation that his work caused the stroke, is that the evidence that you say may not have come up at trial, or are you talking about a different kind of evidence? Well, both. Causation. I mean, I don't think anybody's arguing that his stroke was caused by his work. At least maybe they did in district court, but now it's clear the argument is that this is a suit over bad medical care after the stroke. Right. And the second issue of medical causation would have been whether, once he suffered the stroke, whether there's anything that could have been done for him in the first place. Okay. It seems to me that both sides are arguing about a factual situation that is not in the case law. As many workers as there are out there, and as many injuries and sicknesses that arise connected or not connected directly to the labor of the employee, it's not in the case law that you're talking to us about that specifically deals with indemnity responsibilities on those facts. Is that a fair statement? On the specific facts here, I think that's fair with the caveat that I think Fontenot and Marathon and International Marine adequately covered this situation because they defined the outer bounds of what the phrase arises out of means. And we just contend that that phrase arises out of, has a meaning. The reason I'm asking for specific situations, and both of us, the panel as well as opposing counsel, I'm getting to, is it enough, and you're saying no, but I'm looking, we'll need to figure it out. Is it enough that the obligations of this employee were to be at that location for 28 days, and if he was seriously injured, either he knew it or some medical professional there knew it, that he could be flown off, but that wasn't known. And so his presence there and the bad medical diagnosis he may have gotten, you say it's disputed, may have gotten there, was a result of his being your employee assigned to that location, had a stroke while he was assigned to that location, and is that therefore arising out of? And I really don't think the case that the district judge relied on is nearly as close to that as is fond to know, but neither really answer the question, none of them really answer the question. I guess my answer to the question would be what's missing there is evidence that his presence on board or his assignment to the vessel had any causative relation at all to anything regarding his outcome, not his care necessarily, but his outcome. And in the absence of any evidence of that, the outcome of the stroke was determined by the stroke. There's no evidence of, you know, and certainly PharmaSafe is not saying they gave him a worse outcome. PharmaSafe's defense all along has been we gave him the outcome he was going to have because he had a stroke. Let me ask you a minor question. Is there any dispute now about which agreement applies to the obligations to 2013 indemnity agreement, the 2018 purchase order, whatever it's called? We've always taken the position that it's the, what we call the MSA, the mutual indemnity and waiver agreement that applies. I don't think there's any dispute, certainly I won't hear any dispute on that from PharmaSafe because the other agreements don't cover any company group to begin with. So if either of those applies, PharmaSafe wouldn't be here. And that's the last point I'd like to make. We still maintain that at the time the settlement was reached by PharmaSafe in this case, PharmaSafe has never been sued by the plaintiff for negligence. It's never been sued by Oceaneering for negligence or indemnity or anything. We brought PharmaSafe in on a theory that if we were held liable for indemnity, we would then have a claim against them. Coal sued Oceaneering. I'm sorry. I'm sorry. Coal sued Oceaneering. Coal sued Oceaneering. Uh, and, and Coal sued Oceaneering as his. Yes, as his, Coal sued Oceaneering as his joint Jones Act employer on a theory of, uh, borrowed servant, which the district court found was the case, uh, and vicarious liability for the acts of PharmaSafe, which the district court also found was the case. Coal didn't sue PharmaSafe, Oceaneering didn't third party PharmaSafe. When we tendered PharmaSafe to Oceaneering, Oceaneering moved to strike and dismiss that claim, which was granted. There were no claims pending against PharmaSafe when it decided to settle the case on the eve of trial, with the exception of we had, we had sought contribution and indemnity on the theory that if we were cast in judgment for indemnity, we would claim against them. That had already been dismissed. So that claim was not live. We had sought contribution from them to any maintenance and cure payment that we had to make. Um, that claim was not settled by PharmaSafe. They've never attempted to settle that. So the claim that they settled had never been asserted against them. The theory of liability that they settled had never been asserted by any party against them or had been asserted and then dismissed on summary judgment. So again, we think the circumstances of that also placed them beyond the ability to claim over against us for indemnity. All right, counsel. Thank you, Judge. Oh, I wish I'd had the whole record. You've got the record, so I'm going to answer this out. I don't know if I have the record citation to it. If you would go in my reply brief on page three, I cite to the joint statement of the case that was signed by all the parties on August the 3rd, 2023, including attorneys for Housman, all pointing to the negligence of its mistreatment and misdiagnosis of Mr. Cole's stroke as a cause of his injuries. Okay, that's in the record, right? And as his last statement that there was no existing pending claim against PharmaSafe, there was a, the third party demand that Housman itself had filed under Rule 14a was still in this litigation as, you know, as was everybody else, except for Housman who settled out separately, which I also detailed in the reply brief. So now, it's true that Cole did not assert a claim directly against PharmaSafe, but that doesn't make any difference. He could have done it. He's got three years to do it under the General Maritime Law, but the law of indemnity in this country has not required that the indemnity actually be sued by the plaintiff before he can settle the case. That hasn't been the law since 1954 in a case that was decided at the Tenth Circuit, which was cited as authority in Fontenot, where you don't, you don't appear, if you are facing a reasonable apprehension of liability, you can settle a case for a reasonable amount of money and then call upon the indemnitor to indemnify you for your settlement. And if you want me to give you the case, I'll give you the case. It's Chicago Railroad and Public Railroad Company versus Dobry Flower Mills, 211 Federal Second 785, 1954, cited by the two cases that were cited by Fontenot, which articulated in this circuit the law of indemnity. All you have to do is to face a reasonable apprehension of liability and make a reasonable settlement. That will trigger the indemnity obligations of the indemnitor, okay? Just follow, have your clerks follow the discussion in the case cited by Fontenot, Tang-Crederiot-Geffion at 406 Federal Second 1039, 1969 case. It lists all the different cases where all it takes is potential, a reasonable apprehension of potential liability. One of them is when the third party was tendered the defense and refused it. We found, Farmers Safe filed a cross-claim against Heisman. They refused the tender of indemnity. Or the defendant's third party claim is founded upon a written contract of indemnification, which is what? Farmers Safe was a third party beneficiary as one of the members of Ocean Earrings Company Group. It was entitled to release the defense and indemnity for any claims arising from damages awarded to any member of Heisman's contract agreement. That's what a reciprocal indemnity agreement provides. And I want to get back to where I started. I've only got a minute and a half to do it. But just how broad this reciprocal agreement was, and this is Exhibit 6 in our record excerpts to you. It's a copy of the contract, the 2013 contract between Heisman and Ocean Earring. Contractor and company wish to modify their relationship at law as well as the indemnity provisions in the 2010 terms of the purchase agreement and avoid entirely disputes as to liabilities for damage or injuries to their respective property or people by providing for a system of mutual indemnity between the parties with respect to their respective people and property during times when the contractor requires access to company's facilities during the performance of the services. He was there. Heisman selected Mr. Cole as the crane operator that was required for the services that they contracted to agree with Ocean Earring. He was out there. It was a 20-day run. He had no place else to go if he had any kind of incident that required medical treatment. Heisman had been providing these kind of services to Ocean Earring for at least 10 years, and Ocean Earring had been providing medical services on board this vessel and other vessels through its arrangement with PharmaSafe under a separate management contract, which is in the record, since 2008. So the reciprocal indemnity agreement applies. They owe the indemnity for the settlement that was entered into by all the parties as reflected and stated in our brief. And if you have any other questions, I'll submit the case. All right, counsel. Thank you, Your Honor. That is all the cases for this panel for this week. We are adjourned.